Michael CHANDLER, et al., Plaintiffs,

v.

Fob JAMES, et al., Defendants.

No. CV 96–D–169–N.

United States District Court,
M.D. Alabama,
Northern Division.

Nov. 12, 1997.

Steven Green, Americans United for Separation of Church and State, Washington, DC, Stephen L. Pevar, American Civ. Liberties Union, Denver, CO, Elizabeth Joy Hubertz, Levin, Middlebrooks, Mabie, Thomas, Mitchell, Papantonio & Lamb, Birmingham, AL, James A. Tucker, Alabama Civ. Liberties Union, Montgomery, AL, Pamela L. Sumners, Birmingham, AL, for Plaintiffs.

Jere L. Beasley, James A. Main, P. Leigh O'Dell, Beasley, Wilson, Allen, Main & Crow, P.C., Montgomery, AL, Alan Eric Johnston, Johnston, Trippe & Brown, Birmingham, AL, William P. Gray, Jr., Legal Advisor to the Governor, Governor's Office, Montgomery, AL, for Fob James, Jr.

William H. Pryor, Jr., Atty. Gen., Thomas F. Parker, IV, Deputy Atty. Gen., Office of Atty. Gen., Montgomery, AL, Jay A. Sekulow, American Center for Law and Justice, Mobile, AL, for Jeff Sessions.

Denise Boone Azar, Michael R. White, Dept. of Educ., Office of General Counsel, Montgomery, AL, Ashley H. Hamlett, Alabama Dept. of Public Health, Montgomery, AL, for Dr. Ed Richardson.

Denise Boone Azar, Larry E. Craven, Dept. of Educ., Office of Gen Counsel, Montgomery, AL, Ashley Hamlett, Alabama Dept. of Public Health, Montgomery, AL, for Bradley Byrne, G.J. Higginbotham, Stephanie Bell, Ethel Hall, Dr. Willie Paul, David Byers, Jr., Sandra Ray, Dr. Mary Jane Caylor.

Donald B. Sweeney, Jr., David P. Condon, Valerie T. Kisor, Rives & Peterson, Birmingham, AL, Oakley W. Melton, Jr., James Eugene Williams, Melton, Espy, Williams & Hayes, P.C., Montgomery, AL, Robert B. French, Jr., Fort Payne, AL, for Weldon Parrish, Jimmy Wilbanks, Johnny Young, Mary Etta Bailey, Willard A. Israel, Tommie Johnson.

Mark A. Rasco, Ralph Gaines, Gaines, Gaines & Rasco, P.C., Talladega, AL, J. Allen Schreiber, Gerald Alan Templeton, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, James Eugene Williams, Melton, Espy, Williams & Hayes, P.C., Montgomery, AL, for Charles E. Kearley, James Braswell, T.Y. Lawrence, Jr., Bonnie Miller, Michael O'Brien, Helen Scales.

## SUPPLEMENTAL OPINION AND ORDER

DE MENT, District Judge.

Pending before the court are several motions and procedural matters that the court finds are due to be addressed.

### I. Plaintiffs' November 6, 1997 Motion To Enjoin The Etowah County Circuit Court Proceedings

On November 4, 1997, the Circuit Court of Etowah County issued a temporary restraining order, ("T.R.O."), "to prohibit the implementation of the District Court Permanent Injunction in this jurisdiction."[1] (T.R.O. at 3.) On November 6, 1997, Plaintiffs filed a "Motion To Enjoin Proceedings In The Etowah County Circuit Court." On the same date, the court issued an Order inviting all parties to respond to Plaintiffs' Motion on or before 2:00 P.M., November 10, 1997.

On November 10, 1997, the Defendant Attorney General of Alabama filed a Response stating that the Etowah County action, styled *Womack v. Etowah County Board of Education et al.*, CV–97–1282–RSM, was voluntarily dismissed by the plaintiffs in that action. A copy of the "Voluntary Dismissal of Action" was attached to the Attorney General's pleading. In addition, and on the same date, the Defendant Governor of Alabama filed a Response in which he urged dismissal of Plaintiffs' Motion to Enjoin based on the

---

1. The court issued a Permanent Injunction in this cause on October 29, 1997 prohibiting and enjoining:(1) enforcement of Alabama Code Section 16–1–20.3 by various state officials; and (2) specific religiously coercive practices in DeKalb County undertaken by school officials pursuant to Alabama Code Section 16–1–20.3. The Perma-

nent Injunction, as well as the court's March 12, 1997 Memorandum Opinion and Order, 958 F.Supp. 1550, also detail activities that are *permitted* pursuant to the First Amendment of the United States Constitution, as interpreted by the United States Supreme Court and the Eleventh Circuit Court of Appeals.

plaintiffs' voluntary dismissal of the proceedings in the Circuit Court of Etowah County.

 Based on the pleadings of the Governor and the Attorney General, as well as the notice of dismissal attached to the Attorney General's pleading, the court finds that Plaintiffs' Motion To Enjoin the Etowah County proceeding is due to be denied as moot.[2]

II. Plaintiffs' November 10, 1997 Motion To Alter Or Amend The Court's October 29, 1997 Permanent Injunction [3]

Also before the court is Plaintiffs' November 10, 1997 Motion To Alter Or Amend The Court's October 29, 1997 Injunction pursuant to Rule 59 of the Federal Rules of Civil Procedure.[4] Plaintiffs filed a Brief in support of their Motion on the same date. Plaintiffs contend that "specific factual findings in [the court's October 29, 1997 Permanent Injunction] will be of great benefit to the parties." (Pls.' Mot. to Alter Or Am. at 1.) In addition, Plaintiffs contend that specific factual findings will satisfy the technical requirements of Rule 65.[5] (Pls.' Br. In Supp. of Mot. to Alter or Am. at 1–2.) Accordingly, Plaintiffs request that the court "make explicit its reasons for granting the injunctive relief it did." (*Id.* at 2.)

Prior to the filing of Plaintiffs' Motion To Alter Or Amend, the court was in the process

---

2. Nevertheless, the court notes that the All–Writs Act, 28 U.S.C. § 1651, and the express exceptions to the Anti–Injunction Act, 28 U.S.C. § 2283, allow federal courts to exercise their discretion to enjoin state proceedings. The court is acutely aware of the principle of comity inherent in our federalist system of government, and the court is reluctant and hesitant to enjoin proceedings in a state court. Federal enjoinment of state litigation is to be the exception, not the rule. *Delta Air Lines, Inc. v. McCoy Restaurants, Inc.,* 708 F.2d 582, 585 (11th Cir.1983). The court is quick to note, however, that when a state court in effect asserts the power of appellate review over the judgments and orders of a federal court properly exercising its jurisdiction, and in addition, the state court interferes with the proper and lawful orders of the federal court, the state court is acting without jurisdictional authority, and enjoinment of its proceedings may be proper. *See generally Mitchum v. Foster,* 407 U.S. 225, 242, 92 S.Ct. 2151, 2161–62, 32 L.Ed.2d 705 (1972); *Wesch v. Folsom,* 6 F.3d 1465 (11th Cir.1993), *cert. denied,* 510 U.S. 1046, 114 S.Ct. 696, 126 L.Ed.2d 663; *Kelly v. Merrill Lynch,* 985 F.2d 1067 (11th Cir.1993); *Battle v. Liberty Nat'l Life Ins. Co.,* 877 F.2d 877 (11th Cir.1989); *McCoy,* 708 F.2d 582; *Southern Petrol. Corp. v. Harper,* 273 F.2d 715 (5th Cir.1960); *Jacksonville Blow Pipe Co. v. R.F.C.,* 244 F.2d 394 (5th Cir. 1957).

This court, and ALL courts for that matter, have the duty and obligation to preserve, protect, and defend rights guaranteed to all citizens under the United States Constitution conflicting state laws are "null and void," and "without effect." *See Edgar v. MITE Corp.,* 457 U.S. 624, 631, 102 S.Ct. 2629, 2634–35, 73 L.Ed.2d 269 (1982); *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981) (citing *McCulloch v. Maryland,* 4 Wheat. 316, 427, 4 L.Ed. 579 (1819)); *see also* U.S. Const. art VI; *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 340–41, 4 L.Ed. 97 (1816); *Ex parte Sizemore,* 611 So.2d 1069, 1071 (Ala.1993); *White v. Reynolds Metals Co.,* 558 So.2d 373 (Ala.1990), *cert. denied,* 496 U.S. 912, 110 S.Ct. 2602, 110 L.Ed.2d 282 (1990). Indeed, the Governor and Attorney General of Alabama recognize this basic foundation of our system of government: "The State of Alabama cannot create, expand, or diminish federal constitutional rights. The State of Alabama must, however, recognize those rights and in conformity with federal law, require its citizens to follow those rights." (Governor and Attorney General's Resp. Br. On Constitutionality of Alabama Code Section 16–1–20.3 at 5–6, filed February 6, 1997.) As the legal, social, and political dictates of the last half-century have shown, federal courts take seriously this responsibility to protect such rights, and can and will intervene where necessary and proper.

3. The court retains jurisdiction over this action during the pendency of Plaintiffs' Rule 59 Motion. *See* Fed. R.App. P. 4(a)(4); *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 59, 103 S.Ct. 400, 402–03, 74 L.Ed.2d 225 (1982).

4. Rule 59(e) of the Federal Rules of Civil Procedure provides:

> **(e) Motion to Alter or Amend Judgment.** Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment.

Fed.R.Civ.P. 59(e). The court issued its injunction on October 29, 1997. Accordingly, Plaintiffs' November 10, 1997 Motion To Alter or Amend comports with the requirements of Rule 59(e). *See* Fed.R.Civ.P. 56(e) and 6.

5. Rule 65(d) provides:

> **(d) Form and Scope of Injunction or Restraining Order.** Every order granting an injunction ... shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other documents, the act or acts sought to be restrained....

Fed.R.Civ.P. 65(d).

of formulating and entering specific findings of fact and conclusions of law in support of its October 29, 1997 Permanent Injunction, as well as addressing pending motions before the court. On October 23, 1997, counsel for some of the named Defendants in this action, filed a "Request For Conference Call." In that request, counsel stated that "[a] long-term and respected educator in the DeKalb County School System has been quoted as saying that 'I'm not going to break the law but I want to find out, or I want our attorneys to find out, if a federal judge can do whatever he wants to whenever he wants to.'" (Req. For Conference Call ¶ 1 (quoting newspaper article attached as App. A).) Counsel stated that the purpose of the Request was "to clarify whether 'a federal judge has the authority to tell school officials and administrators in DeKalb county how to handle the issue of school prayer.'" (*Id.* at 1.) Counsel stated to the court that he sought a conference call "with the Court and the parties to see what rational procedure could be followed to make sure [the educator] is clear what jurisdiction this Court has over public officials in DeKalb County and what can be done to assure that [the educator] does not engage in action that would put him or others similarly situated in contempt of this Court." (*Id.* ¶ 2.)

Counsel's Request reinforced the sensitive and urgent nature of the matter and issues before the court. Prior to his request, the court had issued its March 12, 1997 Memorandum Opinion and Order, ("March 1997 Opinion and Order"), in which the court found that Alabama Code Section 16–1–20.3 was unconstitutional and granted summary judgment for the Plaintiffs on that issue. Plaintiffs' Complaint, however, sought not only a declaration that § 16–1–20.3 was unconstitutional, but also relief from the alleged religiously coercive activities of DeKalb County school officials relying on § 16–1–20.3 in support of their actions.

Even after the court's March 1997 Opinion and Order finding the statute unconstitutional, as noted *supra*, as of October 23, 1997, several motions and issues were still pending, including the issue of the relief necessary to alleviate the alleged religiously coercive activity in the DeKalb County School System. Based on counsel's request, the plethora of pleadings filed by the parties suggesting courses of action and grounds therefor, and the evidence in the record, the court entered its Permanent Injunction on October 29, 1997.[6]

As the introductory paragraph of the injunction notes, it was based on "the court's previous opinions, as well as the record as a whole in this cause." (Permanent Inj. at 1.) The court entered its Permanent Injunction for the reasons articulated above, and herein, and now enters this Supplemental Opinion and Order, including the following "Findings Of Fact And Conclusions Of Law," pursuant to Rule 60(a) of the Federal Rules of Civil Procedure.[7]

### III. Findings Of Fact And Conclusions Of

---

**6.** Additionally, in issuing its October 29, 1997 Permanent Injunction, and the "Findings Of Fact And Conclusions Of Law" articulated in this Supplemental Opinion and Order, the court applied the requirements and standards of Federal Rule of Civil Procedure 65, as well as interpretive case law, in determining the propriety of issuing its Permanent Injunction.

**7.** Rule 60(a) provides:

 **(a) Clerical Mistakes.** Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so

corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.

Fed.R.Civ.P. 60(a). The court is aware of the filing of notices of appeal by various parties in this action. However, as noted, the court retains jurisdiction of this action during the pendency of Plaintiffs' Rule 59 Motion. *See* Fed. R.App. P. 4(a); *Griggs,* 459 U.S. at 59, 103 S.Ct. at 402. Further, the court believes that it is acting within the confines of Rule 60(a).

 In the alternative and in addition to the court's issuance of this Supplemental Opinion and Order pursuant to Rule 60(a), the court finds that Plaintiffs' Motion To Alter Or Amend The Court's October 29, 1997 Injunction is due to be granted. The court's specific findings of fact and conclusions of law are articulated *infra.*

Law [8]

In order to assist the court with identifying evidence in the record, the court directed the parties on April 24, 1997, to identify with specificity the evidence in the record at that time and to attach where possible copies of any documentary evidence already in the record, without further argument or embellishment, that was pertinent to dispositive motions.[9] These submissions, pertinent to dispositive motions, were received in May 1997 from the Plaintiffs and from DeKalb County.

However, further evidence bearing on the Plaintiffs' entitlement to injunctive relief against the DeKalb County Board of Education generally has been filed since May 15, 1997 and is detailed in these findings of fact and conclusions of law. This evidence, generally related to religious practices since that time, has not been challenged or controverted by the DeKalb County Board of Education in any way, by affidavit or otherwise. The court finds that such evidence is appropriately received as bearing on entitlement to injunctive relief against DeKalb County and notes that DeKalb County was welcome to submit, at any time, any evidence that might contravene documents, affidavits, and other evidence submitted by the Plaintiffs in support of their claim for injunctive relief, if it had Such to offer. All of this evidence is aimed at demonstrating to the court that violations have continued despite the pendency of this lawsuit and despite the court's March 1997 Opinion and Order. Accordingly, the court finds it proper and just to consider all evidence in the record for the purpose of issuing these findings of fact and conclusions of law as they bear upon the Plaintiffs' entitlement to permanent injunctive relief and will do so.

The court specifically notes that the Plaintiffs have brought both a facial and "as applied" challenge and that the DeKalb County Board of Education has specifically adopted the position that prayer and devotionals over the intercom, classroom prayer, prayer at

---

**8.** The court makes few factual findings in connection with its March 1997 Opinion And Order on the facial validity of Alabama Code Section 16–1–20.3 as it believes that matter to be one of law and not one of fact. It finds that the only "fact" not already addressed in its previous opinion that is relevant to statutory construction is whether the persons challenging the statute have standing to do so. The court finds that Michael Chandler is an assistant principal at Valley Head High School, within the jurisdiction of the DeKalb County Board of Education, and the father of the minor child Jesse Chandler, a student at Fyffe School, within the jurisdiction of the DeKalb County Board of Education. (*See* Stipulation Number 15 regarding DeKalb County Board of Education's control over these schools.)

**9.** This was necessary because the court had directed that all evidence bearing on factual issues relevant to pending dispositive motions involving DeKalb County be submitted by November 21, 1996. As of that time, however, the record establishes that the DeKalb County Board of Education had not yet responded fully to Plaintiffs' discovery requests and did not do so until after November 21, 1996. When the Plaintiffs received such responses, they submitted them in the order in which they were received, in connection with filings that had nothing to do with discovery *per se*. As a consequence, evidentiary submissions bearing on both dispositive motions and the Plaintiffs' general request for injunctive relief are dispersed throughout the record. For example, DeKalb Defendants' Answers to Plaintiffs' First Set of Interrogatories, apparently served December 3, 1996, were filed with the court as an exhibit to a motion having no relevance to a discovery dispute, as was [DeKalb] Defendants' Response to Plaintiffs' Request for Admissions, apparently served on October 10, 1996. DeKalb Defendants' Responses to Plaintiffs' First Discovery Requests, served February 4, 1997 (answering interrogatories not answered on October 10, 1996) are part of Exhibit C to Plaintiffs' Supplement to Motion for Sanctions and Opposition to DeKalb Defendants' Request for Time. Evidence of probative value, generally, as it relates to injunctive relief is sprinkled throughout the record and has continued to trickle in through the 1997–98 academic year.

Plaintiffs' filings responding to DeKalb County's May 15, 1997 submission include protest that DeKalb may not offer as "stipulations" matters as to which the Plaintiffs refused to stipulate, specifically those stipulations after September 1996 numbered 75 through 81 proffered by DeKalb. Upon Plaintiffs' motion, DeKalb County withdrew any materials that were submitted in May 1997 that varied from evidence that was already in the record.

The court does not rely on any matter that was voluntarily withdrawn by DeKalb upon Plaintiffs' protest that they were untimely attempts to rehabilitate and recast DeKalb County's case after dispositive motions were under submission. The court relies on what the Plaintiffs and DeKalb have evidently agreed are actual stipulations among themselves.

high school graduations, and prayer at student assemblies such as D.A.R.E. ceremonies and events are "non-sectarian, non-proselytizing, student-initiated voluntary prayer, invocations, and/or benedictions." This is the language of Alabama Code Section 16–1–20.3 which this court has previously found to be unconstitutional. Having taken this position in discovery, the DeKalb County Board of Education took the position at summary judgment that the court's decision regarding the statute would resolve most if not all aspects of Plaintiffs' nonfacial challenge.

### A. Factual Findings of Pre- and Post–Suit Conduct As To Pervasiveness Of Unconstitutional Conduct In DeKalb County

The court finds the following relevant to the propriety of awarding permanent injunctive relief:

1. The court finds that school-sponsored religious activity in violation of the Establishment Clause of the First Amendment to the United States Constitution is pervasive and recurrent in the public schools of DeKalb County. The court has examined the degree of scienter of the DeKalb County School Board and its employees and agents; whether the conduct of the Defendants has been isolated or recurrent; whether the Defendants have recognized the wrongfulness of the conduct complained of; and the sincerity of any repentance of the conduct.[10]

The court finds that absent permanent injunctive relief, the substantial likelihood is that the DeKalb County Board of Education and its employees and agents will ignore the court's orders just as it has disobeyed the rulings of higher courts for years—before and after Alabama Code Section 16–1–20.3 was enacted and before and after the Eleventh Circuit outlawed prayer over the public-address system at school-sponsored sporting events. Indeed, the record in this case suggests to the court that its March 1997 Opinion and Order has been unobserved since it was entered. Although the court did not at that time make any specific orders to DeKalb County regarding graduation prayer, prayer over the public-address system, and other challenged matters, the court stresses that it drew that opinion from existing controlling case law and did not pronounce "new" general Establishment Clause law.

As recently as October 23, 1997, counsel for DeKalb County filed a "Request for Conference Call," which states that certain educators wanted clarification on the question of whether "a federal judge has the authority to tell school officials and administrators in DeKalb County how to handle the issue of school prayer" and "if a federal judge can do whatever he wants to whenever he wants to." The pleading specifically expresses the concern of DeKalb County counsel that the Sylvania High School principal and "others similarly situated" would be found by the court to be in contempt. Appended to the filing submitted by the DeKalb County Board of Education is a newspaper article titled, "Principal questions judge's authority in prayer lawsuit." Also appended to that filing is a Letter to the Editor over principal Gary Carlisle's[11] signature which makes plain that Mr. Carlisle believes that only elected officials, and not the judiciary, may traffic in the First Amendment's religion clauses.

Mr. Carlisle's very recent letter states, "I will resist government without representation" in obvious reference to the judiciary and judicially imposed proscriptions on state-sponsored prayer. The court finds the Carlisle letter suggestive of a motive to violate the court's orders and to continue with the *status quo* of unconstitutional conduct in DeKalb County public schools. (Nor is this the only such press clipping with which the court has been deluged in this case.) The court

---

**10.** *See United States v. Laerdal Mfg. Corp.,* 73 F.3d 852 (9th Cir.1995). *See also Newman v. Alabama,* 683 F.2d 1312 (11th Cir.1982) (discussing substantial likelihood of recurrence).

**11.** There is confusion as to the spelling of this school principal's name throughout the record. Mr. Chandler has spelled it "Carlyle," counsel for DeKalb County has spelled it "Carlyle," the reporter for the *Fort Payne Times Journal* spelled it "Carlyle," and the "Letter to the Editor" submitted to the court is signed "Gary Carlisle, Principal, Sylvania High School." It is apparent that all parties refer to the same individual and identify him as the principal of Sylvania High School.

can discern in this evidence no recognition of the wrongfulness of school-sponsored religious activity, sees scienter in the vow to "resist" judicial action, and discerns no repentance of past unconstitutional conduct. The court does not mean to single out Mr. Carlisle for censure. The court finds this statement emblematic of DeKalb County school officials' historical attitudes—judging from the record before the court, this statement typifies an attitude. The court references it specially because it is so recent.

The court also finds relevant that in Spring 1996, all Parties executed an agreement that DeKalb County schools would not undertake any practices alleged by the Plaintiffs to be unconstitutional pending this court's determination of their constitutionality. This agreement, styled "Joint Motion to Vacate This Court's Order and Agreement of Voluntary Cessation of Certain Activity Pending this Court's Decision" (hereafter "Joint Motion"), was filed with the court in March 1996.

■ That document, in the court's view, constitutes a representation of the parties *to the court*, even if the court could not or would not enforce a voluntary agreement among counsel as Plaintiffs requested.[12] However, the fact that the DeKalb County School Board would represent to the court and other Parties that challenged conduct would cease pending the court's final determination—and then continue with such conduct—persuades the court of the pervasiveness of school-sponsored religious activity in DeKalb County and concomitantly, of the need to assure that injunctive relief can be

enforced that will be effective to deter unconstitutional conduct in the future. Had the parties not made that agreement, the court would have proceeded with dispatch on the Plaintiffs' motion for preliminary injunction [13] and would have enforced any orders pursuant thereto. Those orders would have been consistent with the court's March 1997 Opinion and Order on the constitutionality of Alabama Code Section 16–1–20.3, finding that the statute violated both the Free Exercise and Establishment Clauses under the precedential cases.

The Joint Motion promised that the school board Defendants, the DeKalb County Board of Education, and the Talladega City School Board, would cease: [14]

1. "prayers, whether student-initiated or otherwise, at school-sponsored sporting events that use public address systems;"

2. "prayers and devotionals, whether student-initiated or otherwise, at school-sponsored assemblies, held during the school day ... except that noncurricular clubs may meet during noninstructional time;"

3. "prayers and devotionals during classroom time during the school day; except that students have the right to pray, individually and nondisruptively, except when required to be actively engaged in school activities, *e.g.*, students may not decide to pray just as the teacher calls on them;"

4. "distribution of religious literature, including Bibles and invitations to religious events, to students by school officials or non-

---

**12.** The court notes that as a matter of law, voluntary cessation is not a defense to unconstitutional conduct. *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Jurisdiction may abate if there is no reasonable expectation the alleged violations will recur and if intervening events have completely and irrevocably eradicated the effects of the alleged violations. *Hall v. Board of Sch. Comm'rs of Conecuh County*, 656 F.2d 999 (5th Cir. Unit B 1981). The court concludes that this is plainly not the case here and that violations have continued to occur during the pendency of this lawsuit.

**13.** The court had initially consolidated the preliminary injunction with the hearing on the merits. The Defendants' action had the effect of forcing forbearance of the hearing on the Plaintiffs. At the Parties' request, in the terms of the

Joint Motion, the court vacated its Order setting an immediate hearing on the merits and set a trial date. In the interim, dispositive motions were filed as to issues specific to DeKalb County and the parties agreed to submit the facial challenge to the statute on briefs. (*See* Order of February 28, 1996 vacating hearing date.)

**14.** Both Governor James and then-Attorney General Sessions disavowed any knowledge of the actions of school officials in DeKalb County in the Joint Motion. The Governor asserted therein that "he is not able to determine what activities may have heretofore been engaged in by other defendants, *i.e.*, school officials or agents and school boards." The Attorney General asserted that the activities in DeKalb County were "purely local in nature." (Joint Motion, ¶¶ 4, 5.)

school persons during the school day on school premises; however, students and non-school persons have the right to distribute religious literature on school premises during noninstructional time, subject to the same reasonable time, place and manner restrictions imposed on the distribution of all non-school literature;"[15]

5. "prayers and devotionals, whether student-led or otherwise, at school-sponsored graduation ceremonies;"

6. "the meetings of student Bible clubs, including the meetings of the Fellowship of Christian Students, occurring during instructional time; however, all noncurricular student clubs may be allowed to meet pursuant to the Equal Access Act during noninstructional time." (Joint Motion, ¶ 6 and subparts.)

In exchange for this agreement not to do what was sued on here until the court ruled on the Plaintiffs' constitutional challenge, the Plaintiffs voluntarily "agree[d] not to seek preliminary injunctive relief in reliance upon defendants' agreement to cease the activities ... pending a determination of their constitutionality." (Joint Motion, ¶ 8.)

Plaintiffs' "reliance upon defendants' agreement to cease the activities" was not misplaced as to the Talladega City Defendants. The Plaintiffs brought no complaint to the court concerning Talladega's performance on its promise to them and its representation to the court. The Plaintiffs' claims against the Talladega Defendants were resolved through a consent decree, over the objections of the Governor and the Attorney General which both the Plaintiffs and the Talladega Defendants urged the court to overrule in both separate and joint filings. There have been no complaints of violations of that consent decree.

In contrast, the Plaintiffs have produced a mound of evidence of DeKalb County's breaches of the Joint Motion, which indicates to the court DeKalb County's predisposition to break promises. The court assigns weight to this, not because it has any inclination to enforce the terms of a voluntary agreement among counsel, but because it persuades the court of the depth of resistance toward ceasing unconstitutional practices on the part of the DeKalb County School Board and of the pervasiveness of school-sponsored religious practices in DeKalb County, that do not cease despite express agreement, the pendency of a lawsuit, and the court's earlier March 1997 Opinion and Order. If DeKalb County school officials persist in conduct alleged to be unconstitutional while this suit is pending and despite their promise not to persist, this court could not expect its Orders to be obeyed, any more than the Eleventh Circuit and the United States Supreme Court have been obeyed, absent an enforceable enjoinment of specific practices that are demonstrably violative of law.

Shortly after the Joint Motion was signed, Michael Chandler tendered a Declaration informing the court that he attended the 1996 commencement at Sylvania School and witnessed a "Historian Address" delivered by a student that ended, "In His name we pray, Amen." Exhibit A to that Declaration is a copy of the Sylvania School program on which is printed an entry for "Historian Address." Mr. Chandler also submitted copies of the programs for various other commencements in DeKalb County public schools which list invocations and benedictions given by students and copies of the programs for various other assemblies and school-sponsored events which indicate that devotions were given. Several of these documents show that DeKalb County public schools printed the commencement and baccalaureate services on the same program and that school principals took part in the baccalaureate services by way of introducing ministers. (All of these documents have been authenticated by the DeKalb County School Board in the discovery process.)

Mr. Chandler also testified in that Declaration that a Bible reading was given by a student at a compulsory assembly at Fyffe High School while Jesse Chandler was in attendance. Mr. Chandler testified in this

---

**15.** The absence of any policy of general applicability in DeKalb County public schools as to time, place, and manner restrictions is admitted by Weldon Parrish in his affidavit executed October 30, 1996.

Declaration that he complained to the principal of Fyffe School about violations of the Parties' agreement and was told in response that the principal knew nothing about the Joint Motion and that he had not been informed by the DeKalb County Superintendent's office of the Parties' agreement. Other evidence in the record indicates that an individual school board member, Willard Israel, indicated not only that he would not comply with any agreement, but that the agreement was a matter between the attorneys and not the Parties. (Ex. B to Pls.' Supp. to Mot. for Sanctions and Opp. to DeKalb Defs.' Req. for Time.) DeKalb County has never challenged the Plaintiffs on any of these matters or offered any evidence to contravene Mr. Chandler's testimony as to the matter of the Bible reading/student devotional at Fyffe and school officials' professed ignorance of the terms of the Joint Motion.

Mr. Chandler offered a further Declaration dated November 10, 1996, in support of the Plaintiffs' November 21, 1997 Motion to Enforce the Joint Motion. A videotape made by Mr. Chandler depicting (among other things) prayer over the public-address system at a Geraldine High School football game on October 19, 1996 was submitted as Exhibit B to the Declaration dated November 10, 1996.[16] The court has viewed the videotape, and

considers it powerful evidence of DeKalb County Schools' defiance of Eleventh Circuit law as pronounced in *Jager* almost a decade ago as well as evidence of DeKalb County's disregard for the proceedings pending here. The videotape features one of the intervenors,[17] a minor at Geraldine High School, leading the prayer and discussing her action with the news media. (*See also* Exhibit C to Plaintiffs' Opposition to motion to Intervene.)

Mr. Chandler's November 10, 1996 Declaration also indicates that devotionals took place in elementary schools after the Joint Motion was signed and that Bible Club students at Valley Head High School were excused from class on May 24, 1996 to distribute information about baccalaureate services to each classroom. Mr. Chandler also testified that members of the band were required to attend the baccalaureate service at Valley Head High School. Additional programs from 1996 school graduations were appended as exhibits to this Declaration. Programs showing the same practice before the filing of this lawsuit were appended to the Complaint, and the Plaintiffs had alleged their illegality. Even under scrutiny as to these practices, school officials in DeKalb County did not desist.

---

**16.** That videotape also shows student-led prayer over the microphone at graduation. It is of poor quality, but it is clear what is depicted. Mr. Chandler testified in his Affidavit of February 1 that he had videotaped graduation prayers and pre-game prayers prior to the filing of this lawsuit. The graduation prayer depicted on this videotape is the prayer occurring at graduations prior to the filing of this lawsuit.

The court reiterates that there are two videotapes, one including pre-suit graduation exercises and pre-game prayer in a series of short clips and ending with the October 19, 1996 prayer over the public-address system by Ms. Sexton at Geraldine High School, and the other depicting the 1997 graduation prayer at Collinsville, Plainview, and Sylvania as well as classroom prayer at Geraldine. The videotape filed November 21 with the Motion to Enforce includes the pre-suit graduation prayer as well as the post-suit October 1996 football game prayer. The first videotape is Exhibit B to the Plaintiffs' Motion to Enforce; the second, showing the 1997 graduation prayers, is Exhibit B to the June 9, 1997 Declaration of Michael Chandler. (*See* Affidavit of Michael Chandler, Feb. 1, 1996, at ¶¶ 6, 9; Plaintiff Michael Chandler's Designation of Ex-

hibits and Materials Already in the Record for Rule 56 Purposes, n. 4 (filed November 21, 1996).)

**17.** The intervenors were allowed in for the limited purpose of *amicus curiae* participation. The court accepted affidavits from them. Had they intervened timely, when this suit was filed or before summary judgment submissions and the court's March 1997 opinion, the court would have granted intervention. The intervenors' affidavits do not merit separate or extended discussion. Bible Clubs may meet consistent with the Equal Access Act; religious jewelry may be worn; students may wear "Victory Line" t-shirts of the sort depicted in Exhibit C to Plaintiffs' Opposition to Motion to Intervene or in the Alternative, Motion to Strike, consistent with school policy; students may organize the "Meet me at the Pole" event; and may generally do all the things the court discussed at pages 23 and 24 of its earlier opinion—and more. This court does not undertake to give a complete catalog of possible free exercise rights. The intervenors' position is apparently that the Free Exercise Clause negates the Establishment Clause. The court has already rejected that position.

Yet a further Declaration Under Penalty of Perjury, executed June 9, 1997, was tendered by Mr. Chandler describing events at May 1997 graduation ceremonies and prayer in the classroom at Geraldine School. Once again, some of these events were captured on videotape.[18] The videotape shows that there definitely is prayer at the Plainview High School graduation in the manner in which Mr. Chandler's June 9, 1997 Declaration describes it. In addition, the court has observed that there definitely is prayer at a graduation ceremony which ends by invoking the name of Jesus, as paragraph 3 of the Declaration recites regarding Sylvania High School.

At Sylvania High School, Mr. Chandler testified in this Declaration, "Just as occurred last year under the guise of a 'Historian Address,' as I swore in my previous Declaration, the 'Greetings' by the class 'historian' were explicitly a prayer. The 'historian's' prayer ended in Jesus' name and was offered over the public-address system. Gary Carlyle, the principal, was seated in close proximity at the time of the prayer, as the videotape accompanying this Declaration depicts. I believe that the phrase 'historian address' or the designation of a student as historian' is Sylvania's code for prayer at graduation." This lawsuit was pending at the time of both the 1996 and 1997 Sylvania graduations described.

Mr. Chandler further testified in his June 9 Declaration that at Collinsville High School in May 1997, for example, he witnessed both a benediction and an invocation. He testified that at Plainview High School, a student walked to the microphone to announce an invitation to prayer and walked away from the microphone to lead the prayer during the time listed on the school program as the "Special Music" segment of the ceremony. At Valley Head High School, he testified, a student recited the Lord's Prayer.

Once again, the June 9 Declaration was accompanied by various programs from various ceremonies evidencing benedictions, invocations, and baccalaureate exercises listed on the same program as the graduation exercises, just as was the affidavit that accompanied the Complaint.

In the June 9 Declaration, Mr. Chandler also testified that Jesse Chandler has been harassed by schoolmates at Fyffe School:

Fyffe School students are led to lunch every day and cannot leave the campus for lunch; the school has a closed-campus policy. In approximately October 1996, Jesse began experiencing harassment in the lunchroom. I am aware that the agreement signed by my lawyer and De-Kalb's lawyers states that school officials will intercede to stop harassment based on religious belief.[19] Virtually every day between October 1996 and April 1997, approximately 175 out of 200 students in the lunchroom stood up and prayed aloud when Jesse entered the lunchroom. On one or more occasions, a student would announce on Jesse's arrival, 'One, two, three, pray.' I discussed this situation about two weeks after it started happening with principal Danny Ashley, who admitted to me that this was occurring in systematic fashion.

I also complained to Superintendent Parrish. Both Ashley and Parrish told me that lunch time was noninstructional and students could do whatever they want. I do not challenge the right of small groups of students or individual students to pray nondisruptively at lunchtime. However, a mass, audible prayer offered specifically because my son has entered the lunchroom is in my view harassment that school officials should intercede to stop, particularly in view of the captive-audience problem. DeKalb County agreed that its school officials would intercede to stop harassment based on religion and has not done so

---

**18.** The prayer in the classroom, according to the Declaration of the reporter who observed and filmed the classroom prayer which has been submitted to the court on videotape, was in the sixth-grade classroom prior to the lunch period. Jim Melchiorre's Declaration establishes that the teacher announced lunch and the students stood, recited the Pledge, and prayed *en masse.* Mr. Melchiorre testified that he was told by student/intervenor Leslie Sexton to go to this particular classroom to film.

**19.** *See* Exhibit A to Joint Motion.

despite my requests and the requests of my counsel.

... I do not want my son harassed every day in this way and for school officials to shirk their duty to stop the harassment. The students' behavior has been organized and vindictive. In April, I told Jesse to take his lunch to my wife Barbara Chandler's classroom and to eat his lunch there to escape the harassment. I did so around the time that Jesse told me that the students were going to offer a Bible reading at lunch because they had heard I was going to be on campus that day. Technically, what I told my son to do is a violation of school policy, because he is supposed to be in the lunchroom during the lunch period. However, I felt that I must do something to prevent his being further stigmatized based on this lawsuit.

Two further Declarations of Mr. Chandler were submitted to the court in September 1997, during this school year. One, as amended, establishes that Mr. Chandler witnessed a prayer over the public-address system at a football game with the school principal in attendance. The second September 1997 Declaration offers testimony that at Valley Head High School, on September 12, 1997, the public-address system was used at a high school football game for announcing that " 'a couple of moments of prayer' would be had following the National Anthem."

All of these activities took place or continued to take place after the court had issued its March 1997 Opinion and Order, which makes express reference to the Eleventh Circuit's specific proscription of prayer over the public-address system in *Jager v. Douglas County School District,* 862 F.2d 824 (1989) Chandler, at pages 1556–57.

There is further evidence in the record predating the court's March 1997 Opinion and Order.

In his affidavit submitted with the Complaint, Mr. Chandler testified that the 1995 DeKalb County graduation ceremonies and other year-end activities included prayers and devotionals. Mr. Chandler testified in this affidavit that Crossville High School used clergy for this purpose; Exhibit 1 to this affidavit demonstrates that the Reverend

Bob Coleman gave an invocation and benediction at Awards Night May 18, 1995 and that the Reverend Wes Garner gave an invocation at graduation. A Plainview School Announcement is discussed in Mr. Chandler's affidavit and is Exhibit 2 thereto; Mr. Chandler testified that students were excused from class to attend baccalaureate practice in May 1995. Exhibit 2 states, "May 19—3rd period—(Friday)—BACCALAUREATE PRACTICE—This will take only one period. You will have regular classes 4, 5, 6, 7 periods." Exhibit 2 also indicates that senior-class members should get any materials for inclusion on the graduation program, such as "singers, songs, prayers" ready for submission to the printer of the school's graduation program.

Exhibits 3, 4, 5 and 6 to the affidavit, all from May 1995 before the lawsuit was filed, demonstrate that the religious service is listed with the graduation program—just as was the case after the lawsuit was filed in both 1996 and 1997. The court finds that the pending lawsuit made no difference to this intermingling of the private religious service with the school-sponsored graduation ceremony; the practice was the same in 1995 as in 1996 and 1997.

Mr. Chandler testified in his February 1, 1996 affidavit, "Since 1985, through the Fall of 1995, I have witnessed pre-football game prayer at Valley Head, and at Geraldine, Fyffe and Plainview games." (Apparently, Mr. Chandler was complaining about this practice even before the Eleventh Circuit had issued a ruling directly on point.) Mr. Chandler testified in this affidavit that Superintendent Weldon Parrish had told him that prayer at school football games was a tradition that would not be stopped. Mr. Chandler attached to his affidavit as Exhibit 7, an August 2, 1989 newspaper article quoting Superintendent Parrish as stating that school principals could have prayer over the loudspeaker at high school football games if they wished, in accordance with tradition, despite the Eleventh Circuit's ruling to the contrary. In paragraph 20 of its Amended Answer, the DeKalb County Board of Education admits that Superintendent Parrish had referred to prayer over the public-ad-

dress system at high school football games as a tradition.[20]

Mr. Chandler testified in his affidavit that he wrote a letter of complaint to Superintendent Parrish on August 3, 1989 regarding the newspaper article of August 2, 1989 and the quotations attributed to school officials. The letter expresses Mr. Chandler's concern that school officials had expressed that they would disobey the law and asks Superintendent Parrish to "consider adopting [a] board policy stating that all employees will obey the law and respect the differences in religion that exist in this country." That letter is appended as Exhibit 9 to Mr. Chandler's affidavit and is authenticated in his affidavit. Mr. Chandler testified in his affidavit that he received no response. In their Amended Answer, paragraph 20, the DeKalb County Defendants "admit plaintiff Chandler wrote to Superintendent Parrish and the DeKalb County School Board expressing his concern over school sponsorship of religious activities." They also admit the "remaining allegations" of paragraph 20, which include the allegation that Mr. Chandler received no reply to his letter of complaint.

All of this undisputed evidence about events and practices before this lawsuit was filed, as well as the undisputed evidence of ongoing school-sponsored religious activities after the Parties made representations to the court through filing their Joint Motion and after the court's March 1997 Opinion and Order, indicate to the court that injunctive relief is necessary. DeKalb County has disregarded its representations to the court and the Plaintiffs, has ignored the obvious import of the court's March 1997 Opinion and Order, and has continued, in action repetitive of or similar to conduct before the lawsuit was filed, to: (a) permit mass vocal prayer in the classroom at Geraldine School, when the teacher announces the lunch period; (b) use the public-address system to deliver prayer and to call for prayer prior to high school football games at several schools; (c) offer student-led prayers at graduation ceremonies, among them prayers presented in the guise of "historian addresses" two years in a

row; (d) offer student-led prayer at graduation that is decidedly Christian and therefore sectarian; (e) intermingle private religious service with official graduation exercises; and (f) refused to halt harassment based on religion where they have notice of it and to take effective action to deter violations by students, school officials, and nonschool persons.[21] The conduct is certainly recurrent, and almost certain to remain so absent an injunction.

This court has been besieged by motions and requests for clarification of its March 1997 Opinion and Order, which the court thinks sufficiently clear not only as to the court's ruling that Alabama's most recent school-prayer statute is facially unconstitutional, but as to all the case law demonstrating why that is so that has been controlling for some time. This court indicated in its March 1997 Opinion and Order that it rejected the Fifth Circuit's rule on student-initiated graduation prayer as inconsistent with *Lee v. Weisman* and with the Eleventh Circuit's holding, rationale, and opinion in *Jager v. Douglas County*. As recently as October 23, 1997, DeKalb County again requested "clarification" from the court as to whether the federal court "has the authority to tell school officials in DeKalb County how to handle the issue of school prayer."

Finally, the court notes that Plaintiffs have represented in several filings that they have on several occasions proffered a consent decree to the DeKalb County Defendants. (*See, e.g.*, Supplement to Motion for Sanctions and Opposition to DeKalb Defendants' Request for Time, ¶ 3 & n. 3.) The DeKalb County Defendants have consistently taken the position that the Plaintiffs' challenges to their specific practices would be mooted by the court's ruling on the statute. The DeKalb County Defendants' discovery responses take the position that challenged conduct was undertaken pursuant to the statute. (*See* DeKalb Defendants' Answers to Plaintiffs' First Set of Interrogatories, Responses 5, 9, 11 and 12, responding "Yes" to interrogatories inquiring whether this

---

**20.** The court notes that "tradition" contemplates ongoing, repetitive conduct.

**21.** *See* Exhibit A to Joint Motion; footnote 16 of court's March 1997 Opinion and Order.

conduct, including a teacher's asking for student volunteers to pray was "non-sectarian, non-proselytizing, student-initiated voluntary prayer, invocations, and/or benedictions.") The DeKalb County Defendants argued that summary judgment should be denied because the court's opinion on the statute would moot most if not all issues as to them. In other words, DeKalb argued that a facially unconstitutional statute would not shield it from constitutional violations avowedly undertaken pursuant to it, and that a ruling of facial invalidity would necessarily mean that myriad activities undertaken under the statute were unconstitutional. Accordingly, when the court struck the statute, it ordered DeKalb County, in conformity with DeKalb County's own expressed views, to sit down with the Plaintiffs and attempt resolution of nonfacial claims.

The response to court-ordered settlement discussions between the Plaintiffs and DeKalb County was still rejection of any settlement despite DeKalb's own argument that a facial ruling would be dispositive of other claims. It is apparent to the court from the evidence, and even from recent DeKalb County filings, that unconstitutional conduct will not be *willingly* stopped by elected school officials. The court notes this not to chide, but by way of explaining why it believes that DeKalb County school officials are unlikely to take steps to cause popular, but illegal, activity to cease. The court thinks it apparent from the long history of pregame prayer, from the admission that Superintendent Parrish believes it to be a tradition, and from the recent necessity of a conference call to discuss a high school principal's expressed views (at the request of his counsel on the representation that clarification of the March 1997 Opinion and Order was necessary), that court-ordered terms are the only means of relief.

If DeKalb County has specifically contended throughout this litigation that student-initiated prayer at football games, assemblies

and events, and at graduations was done pursuant to the statute, and this court ruled in March 1997 that the statute was unconstitutional, at a minimum, this conduct pursuant to the statute should have ceased.

Where the court finds that state officials are unlikely to enforce the terms of a state statute that has been struck, it may order only declaratory relief and withhold injunctive relief.[22] Here, however, officials flagrantly defied the Eleventh Circuit rule on prayer over the public-address system and continued to do so after this lawsuit was filed. Here, even after this court's March 1997 Opinion and Order, "student-initiated" prayer continued with the use of the school facilities and in particular the public-address system.

In view of the history of pervasive religious activity in the schools operated by the DeKalb County School Board, the court determines that an injunction of the DeKalb County School Board is necessary. It is not in every jurisdiction that one hears of organized, school-sponsored prayer in the classroom more than three decades after *Schempp* and *Engel.* Yet here, according to DeKalb's own discovery responses. stipulations, and Amended Answer, Jesse Chandler's teacher Ms. Carroll "may have selected devotionals for students to read," "asked for volunteers to lead prayers," and permitted prayer. (Stipulation 46; Amended Answer, 16.)[23] Moreover, after this lawsuit was filed, classroom prayer at Geraldine School has been videotaped, and the manner in which it proceeds is upon the teacher's announcement of the lunch period. (*See* Affidavit of Jim Melchiorre.) The manner in which it proceeds is out loud and in unison.

In view of this and the above, the court finds that the monitoring it orders by its injunction is appropriate and necessary. It has been demonstrated to the court's satis-

---

**22.** *See Gay/Lesbian/Bisexual Alliance v. Sessions,* 917 F.Supp. 1548, 1557–58 (M.D.Ala.1996).

**23.** Admissions such as these support Plaintiffs' argument in their briefs that ostensibly "student-initiated" activities hazard the possibility that school officials will simply delegate religious ac-

tivity to students, who act as their surrogates. On this basis alone, in conjunction with evidence such as this, a court could strike the statute or the practice under *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

faction that simple declaratory relief would, in DeKalb County, be no relief at all.

■ The court further finds that in-service training is warranted as a necessary component of injunctive relief. The evidence in the record indicates that school officials apparently see no error in failing to curtail organized classroom prayer; in allowing the public-address system to be used for prayer at school-sponsored sporting events; in allowing not only student-initiated prayer at graduation, but allowing explicitly Christian prayer at graduation ceremonies; and in failing to adopt a policy of uniform applicability for distribution of materials by nonschool persons that would have obviated the need of the court's ordering them to do so, even though the court admonished DeKalb County at the pretrial conference that the absence of such a policy is a serious matter. All of these things suggest to the court a disregard for the rights of students and parents who might not be members of the majoritarian religion or who might believe that the United States Supreme Court has correctly held for decades that the state may not favor religion, even over nonreligion.[24]

Most importantly, the court is disturbed by the uncontroverted testimony regarding Jesse Chandler. Even if Michael Chandler's November 10, 1996 Declaration testifying that all students are required to attend homeroom periods and that DeKalb County schools are closed-campus schools, so that students may not leave the campus during the school day without permission were controverted, this court still could not find that the lunchroom situation described in the June 9, 1997 Declaration at Fyffe School could continue. The court repeats what it said in footnote 16 of its March 1997 Opinion and Order: disruptive, aggressive, harassing speech by students, even in the lunch setting, is not protected. Michael Chandler's testimony that both the school principal and Superintendent Parrish had notice of the situation and replied that lunch time was "non-instructional" time so they would not intercede convinces the court of the need for brief, one-time-only, in-service training.

The court, by the terms of its injunction, leaves the selection of the curriculum to DeKalb County subject to the court's approval. While the court has suggested a program, its suggestion is for illustrative purposes only and the court would approve any reasonable program of neutral and objective content. All of the matters discussed above, as well as the matters discussed below with reference to the Plaintiffs' dispositive motions, demonstrate to the court that a one-time, in-service training would be of great benefit in clarifying the law for those who must abide by it. The court does not require such in-service training repetitively or for all new hires but requires merely that educational materials be maintained in a form accessible to persons who are hired after the court-ordered in-service training is conducted.

The court finds that this injunctive relief will clarify the law for agents of the DeKalb County School Board and that general instruction in the tolerance of religious diversity that underlies the Establishment Clause's proscription of religious favoritism is necessary and is frankly responsive to DeKalb County's oft-requested pleas for more clarification of the court's March 1997 Opinion and Order. The court expects such training to assist school officials in complying with the injunctive provision regarding school officials' treatment of situations such as Jesse Chandler's lunchroom incident.

The court finds that its provisions for publicizing its injunction are reasonable and not onerous.

The court finds that the nonharassment provision is a general aspect of injunctive relief in cases such as employment discrimination, where Defendants often control the destiny of suing employees and of their witnesses. The court finds the present situation analogous. The court finds that specific provision is warranted as to Jesse Chandler particularly by the fact of Jesse Chandler's experience at Fyffe School. The court finds that specific provision as to Mrs. Whiteside is likewise warranted due to gratuitous references in briefs and affidavits. The refer-

---

24. *See County of Allegheny,* 492 U.S. at 590–91, 109 S.Ct. at 3099–3100; *Wallace v. Jaffree,* 472 U.S. 38, 60, 105 S.Ct. 2479, 2491–92, 86 L.Ed.2d 29 (1985).

ences in Donna Taheri's affidavit and Steve Bowman's affidavit, for example, appear to the court to suggest that these persons, De-Kalb County Board of Education employees, have formed the opinion that Mrs. Whiteside is opposed to school prayer and therefore "trapped" Mr. Bowman into singing a gospel song at a school-sponsored assembly by requesting that he sing a song.

As to all references to Alabama Code Section 16–1–20.3 and any regulations implementing it, the court reiterates its conclusion of March 12, 1997 that the statute is unconstitutional as measured against both the Free Exercise and Establishment Clauses. The court expressly found that "non-sectarian, non-proselytizing student-initiated voluntary prayer, invocation and/or benedictions" as referenced in the statute ran afoul of the test of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The court found state sponsorship and endorsement of religion in students' undertaking prayer, invocations, or benedictions using the state's facilities and machinery. Certain conclusions obviously flow from that; one is that conduct that fits the description of the unconstitutional statute is similarly unconstitutional. The court expressly so finds.

### B. Evidence And Conclusions Upon Dispositive Motions

The court now focuses on the evidence specifically related to dispositive motions in this case, to the exclusion of evidence of continuing violations of law past the time of the filing of those motions, that the court has reviewed above and which demonstrate to the court that declaratory relief alone would be insufficient.

The court notes again that the DeKalb County Defendants have responded to Plaintiffs' interrogatories about devotionals at

D.A.R.E. assemblies; faculty solicitation of student volunteers to lead classroom prayer; devotionals over the intercom; and graduation invocations by students, with the response that such activity was undertaken as "non-sectarian, non-proselytizing, student-initiated voluntary prayer, invocations, and/or benedictions." (*See* Plaintiffs' First Discovery Request to DeKalb Defendants, Requests 5, 9, 11, 12; DeKalb Defendants' Answers to Plaintiffs' First Set of Interrogatories, "Yes" to Requests 5, 9, 11, 12.) The court notes again that it was DeKalb County's position at summary judgment that the court's ruling on the statute would resolve most of these challenges—the court finds that the only exception to this position taken by DeKalb County exists with regard to Gideon Bible distributions.

The court has reviewed the Parties' final filings in response to the court's April 24, 1997 Order from the bench as an aid to its findings, but these filings are aids only and may not reflect all admissible evidence. Findings follow:

1. Stipulations resolve some issues.[25] Thus the court finds that "[p]laintiff Michael Chandler is a resident of DeKalb County, Alabama and is the father of Jesse Chandler, a seventh-grade student born in 1983, who attends Fyffe School." (Stipulation 1.) The court further finds that "plaintiff Michael Chandler is an employee of the DeKalb County Board of Education who works at Valley Head School, where he teaches class and serves as assistant principal and as guidance counselor. In this capacity, plaintiff Michael Chandler is required to attend various school-related activities and events, including compulsory and non-compulsory school-related student assemblies, school-related sporting events, school-related gradua-

---

**25.** The court notes that its Order to the Parties to stipulate to such matters as they could among themselves, apparently produced delay and confusion due to the multiplicity of Parties. In ordering the Parties to stipulate to matters as to which admissions and agreement could be made, the court intended for Parties to use their common sense as to deciding to which Parties a given stipulation is obviously addressed. The court relies on stipulations between the Plaintiffs and DeKalb County for all matters directly affect-

ing DeKalb County and factual allegations specific to it. The court notes that the Plaintiffs have not attempted reliance or attributed any evidentiary significance to the filings of the Governor in this regard. Nor does the court, which finds that the Governor may not contravene or qualify the Stipulations of DeKalb County by means of his own stipulations. The court notes that stipulations would be meaningless as among Parties intending to be bound by them if other Parties could effectively veto them.

tion or commencement ceremonies and other school-related student events." (Stipulation 2.) The court further finds that Michael Chandler is required to attend home football games in his capacity as assistant principal at Valley Head High School. (Amended Answer, ¶ 19.) The court further finds that "[i]n his capacity as assistant principal at Valley Head, Michael Chandler is required to attend graduation/commencement ceremonies at the school." (Stipulation 56.)

2. The court finds that "[t]he DeKalb County Board of Education operates all public schools within DeKalb County, including Valley Head School, Plainview School, and Fyffe School, which schools have students in grades K through 12." (Stipulation 15.)

■ 3. The court finds that "[a]ll DeKalb County high school home football games or other athletic events take place under the general direction or control of the DeKalb County Board of Education, with individual games occurring under the immediate supervision of each home-team principal. All home football games and other athletic events take place on public school-owned or leased property. Public school officials or their agents control access to the public-address systems at all football games or other athletic events, including granting permission for its use." (Stipulation 51.) The court finds that "[i]n 1994 and 1995, prayers and devotionals, as well as the Pledge of Allegiance, have been offered over the public-address system by students and clergy at DeKalb County high school football games." (Stipulation 53; see also Stipulation 55.)

4. The court finds that "graduation/commencement exercises are school-sponsored events for which school principals and other school officials make the ultimate decisions as to the format of the ceremony." (Stipulation 58.) The court further finds that "[t]he graduation/commencement ceremony is considered an integral part of the school educational program and of each student's tenure at school. Graduation/commencement ceremonies are community-wide events frequently attended by non-graduating students." (Stipulation 60.)

5. Exhibit B to the Plaintiffs' Motion to Enforce Voluntary Cessation Agreement, filed November 21, 1996, is a videotape accompanied by a Declaration under Penalty of Perjury of Michael Chandler executed November 10, 1996. The videotape depicts graduation prayer over the public-address system filmed by Mr. Chandler which occurred prior to the filing of this lawsuit and also depicts pre-game prayer over the public-address system at a Valley Head football game that occurred prior to the filing of this lawsuit, on September 1, 1994, according to the uncontroverted affidavit of Michael Chandler. (See and compare Aff. of Michael Chandler, ¶¶ 6, 9; Ex. B to Plaintiffs' Motion to Enforce, Nov. 21, 1996; Plaintiffs' Designation of Exhibits filed Nov. 21, 1996, n. 4; Compliance with Court's Order from the Bench of April 24, 1997 to Point out Evidence Already in the Record Pertinent to Dispositive Motions Filed by Plaintiff ("Exhibit B to Plaintiff's Motion to Enforce, filed November 21, 1996, shows Leslie Sexton, Geraldine High School Student Council President, leading the prayer over the public-address system at an October 1996 football game and also shows a September 1994 pre-game prayer at Valley Head High School").) [26]

6. The court finds that the evidence is uncontroverted that "over the past year,[27] students have lead [sic] the crowds in prayer at certain high school football games in DeKalb County over the public-address system." (Amended Answer of DeKalb County,

---

26. Exhibit B to the Plaintiffs' Motion to Enforce further depicts a pre-game prayer that Michael Chandler has testified occurred on October 19, 1996, after this lawsuit was filed. (See and compare Aff. of Michael Chandler, ¶¶ 6, 9; Ex. B to Plaintiffs' Motion to Enforce, Nov. 21, 1996; Plaintiffs' Designation of Exhibits filed Nov. 21, 1996, n. 4; Compliance with Court's Order from the Bench of April 24, 1997 to Point out Evidence Already in the Record Pertinent to Dispositive Motions Filed by Plaintiff) ("Exhibit B to

Plaintiff's Motion to Enforce, filed November 21, 1996, shows Leslie Sexton, Geraldine High School Student Council President, leading the prayer over the public-address system at an October 1996 football game and also shows a September 1994 pre-game prayer at Valley Head High School").

27. Meaning the year preceding filing of the lawsuit.

¶ 18.) Specifically, Mr. Chandler testified in his February 1, 1996 affidavit that prayer occurred from 1985 through 1995 at his "home" school of Valley Head, as well as at Geraldine, Fyffe, and Plainview games. In Stipulations 53 and 55, DeKalb County admits that such prayers over the public-address system have been had. In addition to the admission in DeKalb County's Amended Answer, the court relies upon Stipulation Numbers 51 and 53, in which it is admitted that the DeKalb County Board of Education, and also school principals, have immediate supervision and control over "home" athletic events and the public-address system and admitted that prayers and devotionals "by students and clergy" were offered in 1994 and 1995 over the public-address system.[28]

■ 7. The court notes that the DeKalb County Defendants, in their Amended Answer, "admit the first sentence of paragraph '22." The first sentence of paragraph 22 of the Complaint alleges that "[t]he graduation services held in each of DeKalb County's eight high schools regularly incorporate religious invocations and/or benedictions." The DeKalb County Board of Education has not denied the allegations of paragraph 22 of the Plaintiffs' Complaint, with reference to invocations and benedictions generally and to clergy-led prayer at Crossville High School. The court finds that in May 1995, a prayer at the graduation ceremony of Crossville High School was led by the Reverend Bob Coleman. (Exhibit 1 to February 1, 1996 Affidavit of Michael Chandler; Complaint, ¶ 22; Amended Answer, ¶ 22.) The court finds that an invocation was given by student Heather Elaine Clowdus at Plainview High School May 26, 1995 and that an invocation and a benediction were given by students Chad Willis and Zack Smith at Collinsville High School's May 1995 commencement. (Exhibit 3 to February 1, 1996 Affidavit of Michael Chandler.) An invocation was also given at the May 1995 Fyffe High School commencement by a student. (Exhibit 5 to February 1, 1996 Affidavit of Michael Chandler.)

Exhibit B to the Plaintiffs' Motion to Enforce depicts various graduation prayers, as earlier stated. The DeKalb County Defendants contend in this lawsuit that student-led graduation prayers are "non-sectarian, non-proselytizing, student-initiated voluntary prayer, invocations, and/or benedictions." (Plaintiffs' First Discovery Request to Defendants, Interrogatory 9; DeKalb Defendants' Answers to Plaintiffs' First Set of Interrogatories, Response to Interrogatory 12.) The court finds this to be expressly true of the May 1995 Valley Head student invocation addressed by Stipulation 63 and Plaintiffs' Interrogatory 12 and that DeKalb's response extends to "such prayers" elsewhere.

The language is that of Alabama Code Section 16–1–20.3, and DeKalb has contended throughout this lawsuit, at summary judgment and elsewhere, that it has permitted such conduct under the auspices of the statute. There is no evidence to the contrary in the record. The court finds that the Plaintiffs and DeKalb County have stipulated to the fact that "[g]raduation/commencement exercises are school-sponsored events for which school principals and other school officials make the ultimate decisions as to the format of the ceremony." (Stipulation Number 58. See also Amended Answer of DeKalb County, ¶ 21.) The court finds that the Defendants admit that the May 1995 Cross-

---

28. The court concludes that *Jager v. Douglas County Sch. Dist.*, 862 F.2d 824 (11th Cir.1989), *cert. denied*, 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989), is totally dispositive of the prayers delivered over the public-address system, regardless of whether student- or clergy-led. "When religious invocation is given via a sound system controlled by school principals and the religious invocation occurs at a school-sponsored event at a school or facility, the conclusion is inescapable that the religious invocation conveys a message that the school endorses the religious invocation." *Jager*, 862 F.2d at 831–32. *See* also *Nartowicz v. Clayton County Sch. Dist.*, 736 F.2d 646 (11th Cir.1984) (finding no meaningful distinction between school officials themselves committing the Establishment Clause violations and permitting students to do so). Pursuant to *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), this is a message that the school may not convey. *See also Jager*, 862 F.2d at 832 (stating that persons of any age may find that state endorses religion and specifically religion believing in prayer thereby denigrating the beliefs of others in violation of Establishment Clause where the school's facilities are used for prayer).

ville High School graduation featured a clergy-led invocation. (Amended Answer, ¶ 22. *See also* Exhibit 1 to February 1, 1996 Affidavit of Michael Chandler.)

Exhibit B to the Plaintiffs' Motion to Enforce depicts various graduation prayers, as earlier stated. There is no evidence to the contrary in the record. The court further finds that the Defendants admit that the May 1995 Crossville High School graduation featured a clergy-led invocation.[29] (Amended Answer, ¶ 22. *See also Exhibit* 1 to February 1, 1996 Affidavit of Michael Chandler.) The court further finds that even if clergy-led prayer occurred but one time,[30] the DeKalb County Board of Education would have no defense to this constitutional violation.[31]

The court concludes that student-led prayer at graduation is unconstitutional as the court understands Eleventh Circuit law and Supreme Court precedents. The court has already declared Alabama Code Section 16–1–20.3 unconstitutional. This federal district court does not judge it to be its province to adopt for Alabama a rule applicable to graduation prayer in another appellate circuit which does not include Alabama, especially where the court finds that rule to be in direct conflict with *Lee v. Weisman* and inconsistent with *Jager* in our own Circuit. As the court stated in footnote 4 of its March 1997 opinion, "the Court believes that the decision in *Jones II* [32] is a departure from established

Supreme Court precedent" and is "inconsistent with controlling Eleventh Circuit precedent." The court further noted in footnote 4 that *Jones II* rested on questionable legal conclusions, did not sweep as far as Alabama Code Section 16–1–20.3, was "aberrational" among the existing Supreme Court and federal appellate cases, and was of limited relevance to the case before it.

The court concludes that *Lee v. Weisman* proscribes even indirect coercion by state officials to pray.[33] The court concludes that, whether pursuant to a statute mandating school officials to permit "non-sectarian, non-proselytizing student-initiated voluntary prayer, invocation and/or benedictions" [34] or not, *Lee v. Weisman* teaches that the state, even when not officially delivering the prayer, may be effectively coercing students who do not wish to hear or participate in prayer to do so by sponsoring prayer at graduation. Under *Lee*, the fact that attendance at graduation ceremonies is not required to obtain a diploma is irrelevant.[35]

In the Eleventh Circuit, pursuant to *Jager*, "when religious invocation is given via a sound system controlled by school principals and the religious invocation occurs at a school-sponsored event at a school or facility, the conclusion is inescapable that the religious invocation conveys a message that the school endorses the religious invocation." [36]

29. The clergy-led prayer is proscribed by *Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), even if nonsectarian.

30. The court notes that it occurred in May 1995, after *Lee v. Weisman* was decided and after *Jones II* was decided in the Fifth Circuit. Even *Jones II* does not countenance clergy-led prayer.

31. The United States Supreme Court and the Eleventh Circuit have held unavailing the argument of school boards that unconstitutional practices may be justified as "relatively minor encroachments on the first amendment. The breach of neutrality [toward religion] that is today a trickling stream may all too soon become a raging torrent and, in the words of Madison, 'it is proper to take alarm at the first experiment on our liberties.' " *Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963); *Jager*, 862 F.2d at 832.

32. The court refers to *Jones v. Clear Creek Ind. Sch. Dist.*, 977 F.2d 963 (5th Cir.1992), *cert.*

denied, 508 U.S. 967, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993).

33. *Lee*, 505 U.S. at 599, 112 S.Ct. at 2661–62; *Engel v. Vitale*, 370 U.S. 421, 430–31, 82 S.Ct. 1261, 1266–67, 8 L.Ed.2d 601 (1962); *Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 224–25, 83 S.Ct. 1560, 1572–73, 10 L.Ed.2d 844 (1963).

34. *See* Plaintiffs' Interrogatory 12 and DeKalb County's Response, "Yes."

35. *See also Schempp*, 374 U.S. at 226, 83 S.Ct. at 1573–74; *Engel*, 370 U.S. at 430, 82 S.Ct. at 1266–67.

36. *Jager*, 862 F.2d at 831–32. *See also Nartowicz v. Clayton County Sch. Dist.*, 736 F.2d 646 (11th Cir.1984) (finding no meaningful distinction between school officials themselves committing the Establishment Clause violations and permitting students to do so).

The court finds and concludes that commencement is "a school-sponsored event at a school or facility" as stipulated by the parties. Within the meaning of *Jager* in this context, such a "religious invocation conveys a message that the school endorses the religious invocation." The court finds that the United States Supreme Court made sufficiently plain in *Lee* that even nonsectarian prayer is proscribed.[37] The court further finds and concludes that nothing in these cases interferes with, for example, a valedictorian's expressive right to make a brief reference to Deity in a valediction.[38] The court concludes that these cases touch in no way upon purely private, voluntary religious expression and that the proscription on school-sponsored prayer has no connection to prayer at baccalaureate services or similar events.

9. The court has, as noted earlier, examined all documents filed with the Affidavit of Michael Chandler of February 1, 1996, several of which consist of official, school-generated programs for DeKalb County commencement exercises as to which authenticity was admitted by the DeKalb Defendants in the course of discovery. (Defendants' Response to Plaintiffs' Request for Admissions, numbers 1–12, filed in various pleadings including Compliance with Court's Order from the Bench of April 24, 1997 to Point Out Evidence Already in the Record Pertinent to Dispositive Motions Filed by Plaintiff.) Exhibit 3 to this Affidavit demonstrates that the baccalaureate service of May 21, 1995 was printed on the same program as the commencement exercise at Plainview High School and that Plainview principal Bob Gray introduced the baccalaureate service. Exhibits 5 and 6 to this Affidavit indicate that the Fyffe High School and Collinsville High School's 1995 commencements were printed on the same program as the baccalaureate services and that at Fyffe High School, principal Nelson Ellis introduced the baccalaureate service. The same is true of various 1996 programs authenticated by the DeKalb County Defendants as to programs doing double duty and showing involvement of school officials. (*See, e.g.*, 1995 program for Plainview High School, showing that principal Billy Ray Morris participated in 1995 baccalaureate program, authenticated in response to Plaintiffs' Request Number 15; Plainview High School "Thirty–Seventh Commencement Exercises" (1995), showing that principal Gray participated in baccalaureate, authenticated in response to Plaintiffs' request Number 20.)

By this observation, the court does not mean to imply that school officials may not *attend* baccalaureate functions, only that they should not, i.e., introduce ministers or lend the aura of school sponsorship to the private religious enterprise. They may not, likewise, as evidenced in Exhibit 2 to the February 1, 1996 Affidavit of Michael Chandler, excuse students from class for baccalaureate practice.[39]

10. Michael Chandler's November 10, 1996 Declaration stated that all students are required to attend homeroom periods and that DeKalb County schools are closed-campus schools, so that students may not leave the campus during the school day without permission. Nowhere in the record is this

---

37. *Lee*, 505 U.S. at 588–89, 112 S.Ct. at 2655–56. Sectarian prayer is obviously proscribed by the Establishment Clause, as cases such as *Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), make clear. Here, the court encounters the anomalous situation of a school board claiming that student-led prayers, some of which are explicitly Christian as depicted on videotape and according to uncontroverted testimony, are "nonsectarian"—because the school board has claimed the statute authorizes the activity. Obviously, graduation services, as the Parties have agreed, are not private time; they are school-sponsored events. To that extent, audiences may not be led in "sectarian" prayers, either.

38. *See In re Gault*, 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967) ("[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone.").

39. Under *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), state actions that fail any one of the three prongs of that test are unconstitutional. The commingling of the private religious commemoration, which is understood to be that, with school graduations is impermissible. School sponsorship, including excusing students from class for baccalaureate practice, is impermissible. The primary effect of such actions is to endorse religion and to convey the message that school officials favor religion.

testimony controverted in such a way as to rob it of legal relevance.

■ The court finds that instructional time is not, as urged by DeKalb County, all time not devoted to academic instruction. For purposes of the Establishment Clause, the court does not look to the curricular or teaching-hour requirements that an accreditation agency might look to; rather, it looks to whether children are required to be present during a particular time. The concern is with the captive-audience problem, not with pedagogical matters. Thus, when Fyffe School fifth-grade teacher Brenda Powell testified in her affidavit that the Gideon Bible distribution of which she spoke "did not take away from the instructional time," the court cannot ascribe legal relevance to that testimony. The court notes that her additional testimony that "[c]ustomarily, a Gideon representative would come in to the classroom during the homeroom period, before classes began and during non-instructional time" amplifies the misunderstanding of the DeKalb Defendants as to the meaning and importance of "instructional time" for Establishment Clause purposes. (*See* Affidavit of Brenda Powell, executed October 30, 1996.)

The court finds that the question of what is "instructional time" for Establishment Clause purposes is a legal question for the court, and it resolves this question with reference to the facts and holding of *School Dist. of Abington Tp., Pa. v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), which it believes dictates that time not being used for actual pedagogical instruction is nonetheless not free time for students and is instead compulsory time in a setting in which attendance in "homeroom period" is required.[40]

The court notes that Ms. Powell teaches at Fyffe School and that her own testimony established that Gideons "customarily" came into her classroom "during the homeroom period." The court having concluded that this is "instructional time" for the purpose of evaluating what is proscribed by the Establishment Clause, does not linger long over the conclusory testimony of Fyffe School principal James Danny Ashley about what is instructional versus noninstructional time. Michael Chandler testified in his February 1, 1996 Affidavit, "From what I have observed over the years, the Gideons distribute Bibles to the fifth-grade students and to the twelfth-grade students." Michael Chandler testified that Gideon representatives entered and addressed Jesse Chandler's class, and Ms. Powell's affidavit confirmed that the Gideons were allowed to make a presentation. Mr. Chandler and Mr. Ashley agree that Mr. Ashley escorted the Gideon representatives to the class.

Principal Ashley, like Mr. Chandler, testified in his affidavit executed October 30, 1996 that Gideon representatives distribute Bibles in the classrooms of the fifth and twelfth grades. Mr. Chandler testified in his February 1, 1996 affidavit that he refused to permit Gideon Bible distributions at Valley Head in November 1994 but that they occurred elsewhere. Mr. Ashley testified that the Gideons "have always" passed out Bibles during homeroom but contrarily testified to an occasion "recently" when "the Gideon representatives were late in getting the Bibles to the 12th grade classes and I took them to a 5th grade class." Elsewhere in his affidavit, Mr. Ashley again reiterated that Gideon Bibles have been distributed in the classroom. The affidavit of Bill Ayers executed October 30, 1996 establishes that for the 16 years he has been a fifth-grade teacher at Plainview School, the Gideons have been distributing Bibles "the entire time I have been there." The DeKalb County Defendants' response to Plaintiffs' Request for Admission Number 15 admits that the Gideons passed out Bibles in Ms. Whiteside's classroom during the homeroom period at Plainview School.

Mr. Ayers testified that "[t]hrough the years, the method of distributing the Bibles may have changed" and like Ms. Powell and Mr. Ashley, offered his legal conclusion as to what is instructional time. He testified that such distributions have been made during homeroom period and that students "have

---

**40.** In *Schempp,* Bible readings *opened the school day;* the practice was struck as unconstitutional. *See also Berger v. Rensselaer,* 982 F.2d 1160, 1171 n. 6 (7th Cir.1993), *cert. denied,* 508 U.S. 911, 113 S.Ct. 2344, 124 L.Ed.2d 254 (1993).

considered [a Gideon Bible], like many other things they obtain through school, a souvenir, and all students generally wanted the Bibles." He also testified that "for the last school year" at Plainview, the Bibles were left in the lunchroom or the principal's office for students to retrieve them as they wished but that classroom distributions "for the last school year" did not occur.

Mr. Ashley testified in his affidavit that the "policy at Fyffe School is to allow community persons and organizations to distribute information in the school." He testified that *he* permitted announcements and distributions of materials. He testified that "this past year, the Bibles were distributed by Gideon representatives standing on the public sidewalk and not on school property." The various affidavits of Mr. Ayers, Mr. Ashley, and Ms. Powell indicate that policies vary widely from school to school, and that the school officials at Plainview after the lawsuit was filed differ from the policies implemented at Fyffe.

The affidavit of Superintendent Parrish again offered a legal conclusion about instructional time that the court has rejected. However, the affidavit makes plain to the court that there is a reason for the divergent treatment of the Gideon distributions: "There is no formal, written policy concerning this, but the general policy is that with the individual school principal's permission, said information is permitted at various times at the schools."

Therein lies the crux of the problem, as the court informed DeKalb County counsel at the pretrial conference in April. Still no policy of uniform applicability was adopted. Jesse Chandler therefore remains subject to the Gideons entering the classroom when he is in twelfth grade, because there is no policy proscribing it.

The court recognizes that sidewalks and streets in front of public schools have been held to be public fora.[41] The classroom is not traditionally a public forum.[42] The court notes that in *Berger,* the defendants relied upon *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) and *Board of Education of Westside Community Schools v. Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), for the proposition that where a school opens its doors to one group, it cannot discriminate against any group. However, the *Berger* court correctly focused on the fact that those cases are distinguishable on the basis of the Equal Access Act.[43] The *Berger* court noted that in those cases the religious organization claiming discrimination sought access to empty school classrooms only, after the school day was over. In *Berger,* the Gideons' access was to the students, an audience. As the *Berger* court observed, "A designated public forum is a place. Children, of course, are not."[44] The Seventh Circuit found that students are essentially a captive audience under the control of their teachers.[45]

The court is not persuaded that a limited public forum has been created in regard to classroom distributions or that it could be with regard to classroom distributions. The court agrees with the *Berger* court that children are not a place and hence finds the classroom distributions here violative of the Establishment Clause. As the *Berger* court stated, "a public school cannot sanitize an endorsement of religion forbidden under the Establishment Clause by also sponsoring non-religious speech."[46] The court finds that the same is true of *classroom* distributions here.

The court does not wish by the terms of its injunction to discriminate against the Gideons International. The court does not intend by its injunction to single out the Gideons for discriminatory treatment or to infringe upon

41. *See Police Dep't of City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

42. *See, e.g., Lamb's Chapel v. Center Moriches Union Sch. Dist.,* 508 U.S. at 392, 113 S.Ct. at 2146–47.

43. The Equal Access Act applies only to secondary schools. 20 U.S.C. § 4071(a).

44. *Berger,* 982 F.2d at 1167.

45. *Id.* at 1168.

46. *Id.*

their free-speech rights. By the same token, the court is disturbed by the absence of uniform regulation by school officials and the "gap" this leaves in the delicate area of the interplay between the rights of nonschool persons and students. It is for this reason that the court's injunction makes reference to the location of students. The court takes it as a simple truism that, where the public schools are concerned, adult nonschool persons cannot harass or act aggressively toward students in regard to distributing *any* materials, religious or otherwise. Such conduct would not be reasonable in time, place and *manner*.

The court assumes that distributions by any and all nonschool persons can and shall be governed by a uniform policy of general applicability in all DeKalb County public schools. By ordering this in its injunction, the court does not mean to encumber ordinary discretion on the part of school principals. However, given the divergent practices to which school officials have testified, the court finds that a single, uniform policy adopted by the DeKalb County Board of Education must establish parameters for school principals so that the Establishment Clause is not violated.

The court will, upon adoption of such a policy by the DeKalb County Board and its approval by the court, modify its injunction to reflect the terms of the policy and to evidence the fact that the court has approved the policy. As reflected in its injunction, the court is disposed to view this policy-making task as the responsibility of the DeKalb County School Board and does not plan to sit as a scrivener over that process or to foist a policy of its own making upon the school board. A reasonable, constitutional policy will be approved and at that time the injunction can be modified to embody only the reasonable time, place and manner restrictions of the policy.[47]

12. Michael Chandler testified in his affidavit that prayer in Ms. Carroll's classroom and Ms. Carroll's selection of students to lead prayers occurred over the course of several years, including in 1995. Mr. Chandler testified that Ms. Carroll was one of Jesse Chandler's teachers in both fifth and sixth grades and that her classroom practices regarding prayer and religious activity were substantially similar in the 1993–94 and 1994–95 school years.[48] He testified that in 1995, Ms. Carroll read from her Bible to the class and selected devotionals for students to read.

 The Defendants put forward no testimony from Ms. Carroll. In paragraph 16 of their Amended Answer, the DeKalb County Defendants admit that Ms. Carroll allowed student volunteers to pray in front of the class. In stipulation 46, the DeKalb County Defendants "admit that Ms. Carroll asked for volunteers to lead prayers." Defendants also admit that Ms. Carroll read aloud from the Bible, and "may have selected devotionals for students to read." The Plaintiffs asked the DeKalb Defendants in discovery, "In paragraph 46 of the DeKalb Defendants' Response to Plaintiffs' Statement of Stipulated Facts, the defendants state, 'Defendants admit that Ms. Carroll asked for volunteers to lead prayers.' Do the DeKalb defendants contend in this lawsuit that such prayers offered by student 'volunteers' are 'non-sectarian, non-proselytizing, student-initiated voluntary prayer, invocations, and/or benedictions'?" The Defendants responded, "Yes."

The court concludes, as it concluded in its March 1997 Opinion and Order, with reference to the statute, that such practices are unconstitutional regardless of whether the practices are ostensibly "voluntary" or "student-initiated" and regardless of whether prayers are nonsectarian or students may be

---

47. The court ordered "immediate" distribution of its injunction to the Gideons for two reasons: it is early in the school year yet, and the board has been ordered to promulgate a policy in a short period of time. The court contemplated that the DeKalb County School Board might feel the need to confer with Gideon representatives

about policies in place in other school systems that might satisfy constitutional criteria.

48. At the time the Complaint was filed, Jesse Chandler was a seventh grader at Fyffe School. Complaint, ¶ 2.

excused from the classroom.[49] The court finds that such classroom practices need not involve direct coercion in the form of a legal penalty or sanction in order to offend the Establishment Clause.[50] The court further finds that it should be clear that activities such as those admitted by DeKalb County have been squarely governed by *Engel* and *Schempp* for some 35 years.

That said, the court further concludes that the teaching of *Schempp* is also that the Bible may be studied for its literary and historic qualities and that "such study of the Bible, when presented objectively as part of a secular program of education" is constitutional. This is distinct from reading devotionals from the Bible absent academic content.

13. The Plaintiffs allege that prayers and devotionals have taken place at school-sponsored assemblies and events and over the school intercom. The court has already addressed scriptural readings and use of religious texts where part of a course of study in its March 1997 Opinion and Order. The DeKalb Defendants specifically admit that student-led devotionals have taken place at Plainview School. (Stipulation 50.) They contend that these devotionals are "non-sectarian, non-proselytizing, student-initiated voluntary prayer, invocations, and/or benedictions." (DeKalb Defendants' Answers to Plaintiff's First Set of Interrogatories, Number 11.) The DeKalb Defendants more specifically contend that such a "devotion" [51] offered at D.A.R.E. ceremonies and events are "non-sectarian, non-proselytizing, student-initiated voluntary prayer, invocations, and/or benedictions." (DeKalb Defendants' Answers to Plaintiff's First Set of Interrogatories, Number 5. *See also* Stipulation 30.) This is the language of Alabama Code Section 16–1–20.3 which this court has previously found to be unconstitutional.

The Plaintiffs further allege that Jesse Chandler attended a D.A.R.E. "graduation" ceremony at Fyffe School on May 18, 1994 at which a student gave a Bible reading and a devotional. The Plaintiffs also allege that in December 1995, the D.A.R.E. ceremony also included prayers and a devotional message as well as teacher-led religious singing. (The Plaintiffs evidently refer to two separate D.A.R.E. events, and the Defendants only to one in the Complaint and Amended Answer.) The court notes that paragraph 26 of the Complaint alleges that the Reverend Graham of Nazareth Baptist Church was invited to speak at the Valley Head D.A.R.E. program in 1994. The Plaintiffs allege that the Reverend Graham quoted from the Bible during his speech. The Defendants admit that the Reverend Graham made references to scripture. (Amended Complaint, ¶ 26.)

All fifth-graders in DeKalb County schools do participate in the D.A.R.E. program. (*See* Stipulation 28.) In Stipulation 30, DeKalb County states, "DeKalb defendants admit that two students volunteered to give words of inspiration at the D.A.R.E. graduation program at Fyffe School on May 18, 1994." The Defendants' response to Plaintiffs' Stipulation 30 that the D.A.R.E.1995 graduation ceremony included student-led prayers and devotionals as well as the singing of a religious song by a teacher was not specifically denied as to prayers and devotions, and it was admitted that a teacher sang a song.

DeKalb also authenticated a program for its May 18, 1994 Culmination Program at Fyffe School which indicates that D.A.R.E. is at least in part sponsored by the DeKalb County Schools. The record indicates that the discovery response authenticating the document was served on Plaintiffs' counsel October 10, 1996. DeKalb also stipulated, in

---

**49.** *Engel v. Vitale*, 370 U.S. 421, 423–24, 82 S.Ct. 1261, 1263–64, 8 L.Ed.2d 601 (1962); *Schempp*, 374 U.S. at 224–25, 83 S.Ct. at 1572–73; *Lee*, 505 U.S. at 599, 112 S.Ct. at 2661–62; *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 279 (5th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 388, 136 L.Ed.2d 304 (1996); *ACLU v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1479–80 (3d Cir.1996); *Herdahl v. Pontotoc County Sch. Dist.*, 887 F.Supp. 902, 908 (N.D.Miss.1995); *Gearon v. Loudoun County Sch. Bd.*, 844 F.Supp. 1097 (E.D.Va.1993).

**50.** *Lee*, 505 U.S. at 592–95, 112 S.Ct. at 2658–60.

**51.** DeKalb Defendants' [Supplemental] Responses to Plaintiffs' First Discovery Requests, Number 5.

September 1996, that the D.A.R.E. program is "operated and managed by the DeKalb County Board of Education and daily administered and managed by Donna Taheri, an employee of the DeKalb County Board of Education." (Stipulation Number 27.)

On October 30, 1996, with Plaintiffs' dispositive motions pending, the DeKalb Defendants tendered the affidavit of Donna Taheri again invoking the phrase "words of inspiration" and apparently disavowing any state action inasmuch as she testified that D.A.R.E. is a program of law enforcement, not a school-run program. While she testified to her opinion that student devotionals are merely inspirational, not religious, and to her recollection that "there has never been a religious activity at any description at a D.A.R.E. graduation ceremony," her own testimony elsewhere in her affidavit is that some students at D.A.R.E. graduation ceremonies gave Bible readings.

Similarly, in Interrogatory Number 11, the Plaintiffs ask: "In paragraph 50 of the De-Kalb defendants' Response to Plaintiffs' Statement of Stipulated Facts, the defendants state, 'Defendants admit that student-led devotionals have taken place at Plainview School.' Do the DeKalb defendants contend in this lawsuit that such prayers offered by student 'volunteers' are 'non-sectarian, non-proselytizing, student-initiated voluntary prayer, invocations, and/or benedictions'?" DeKalb responded, "Yes."

Since all of the Parties, as well as the Court, appear to be of the opinion that a "devotional" is a religious exercise, that falls within the category of "prayer, invocations and/or benedictions," and the Court finds that for the same reasons it has found that under established United States Supreme Court precedent that vocal prayers led by students in the classrooms are unconstitutional, student-led "devotionals" are similarly unconstitutional.[52] This applies to devotionals at Plainview as well as to devotionals at school-sponsored events, such as D.A.R.E. events.

The court's findings about the religious nature of devotionals, and the conclusion that D.A.R.E. is a school-sponsored activity, compel the conclusion that use of state facilities, including the intercom, for these religious messages is a violation of the Establishment Clause. The court is not persuaded that anything in the Defendants' affidavits, moreover, establishes any de minimis exception to the establishment clause. Schempp's admonition that no breach is trivial controls the court's analysis.

The court finds that based on the Defendants' affidavits, devotionals and prayers occurred at Plainview School. The court specifically finds that DeLayne Etherton's affidavit establishes that on Veterans Day 1995, a prayer occurred at the conclusion of a student message. The court also finds that prayer is not mere ceremonial Deism of the sort contemplated by the "in God we Trust" motto on our currency. Accordingly, the court cannot find that prayer should occur on ceremonial occasions such as Veterans Day or any other of the numerous holidays celebrated in the public schools. Nor does the court find any justification for prayer over the intercom as a gesture of patriotism. Indeed, numerous Supreme Court cases counsel against tying religion to patriotism and obviously, against identification with the state. The court concludes that there is neither a de minimis nor a "national crisis" exception to the establishment clause. See generally, Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984).

### Order

Based on the foregoing, it is hereby CONSIDERED and ORDERED that:

(1) Plaintiffs' November 6, 1997 Motion To Enjoin Proceedings In The Etowah County Circuit Court, be and the same is hereby DENIED AS MOOT.

(2) Plaintiffs November 10, 1997 Motion To Alter Or Amend The Court's October 29, 1997 Permanent Injunction be and the same is hereby GRANTED. The "Findings Of Fact And Conclusions Of Law," upon which the court

---

**52.** See Engel, 370 U.S. at 423–24, 82 S.Ct. at 1263–64; Schempp, 374 U.S. at 224–25, 83 S.Ct. at 1572–73; Lee, 505 U.S. at 599, 112 S.Ct. at 2661–62.

based its October 29, 1997 Permanent Injunction, are articulated herein.

(3) In addition and in the alternative to GRANTING Plaintiffs' November 10, 1997 Motion To Alter Or Amend: Pursuant to Federal Rule of Civil Procedure 60(a), this Supplemental Opinion and Order, and the "Findings Of Fact And Conclusions Of Law" articulated herein shall be and the same are hereby considered issued concomitantly with the court's October 29, 1997 Permanent Injunction *nunc pro tunc.*

(4) The court's Memorandum Opinion and Order, issued concomitantly, on this date, with this Supplemental Opinion and Order, shall be and the same is hereby INCORPORATED BY REF-ERENCE into this Supplemental Opinion and Order.[53]

(5) The court's October 29, 1997 Permanent Injunction shall remain in full force and effect pending an Order from the Eleventh Circuit Court of Appeals or the issuance of a subsequent Order from this court upon due consideration of the Defendant Attorney General's "Motion For Partial Stay Of Permanent Injunction" filed November 10, 1997.[54]

---

**53.** In its Memorandum Opinion and Order, the court grants Plaintiffs' September 27, 1996 Motion For Partial Summary Judgment. The court finds the granting of this motion, and the findings of fact and conclusions of law articulated therein, to be an integral, although not dispositive, portion and basis of its "Findings Of Fact And Conclusions Of Law" articulated in this Supplemental Opinion and Order, supporting its October 29, 1997 Permanent Injunction. Many of the findings of fact in each document are repetitive, however, the court's Memorandum Opinion and Order more clearly articulates those facts that are uncontroverted or which are clearly established for purposes of resolution of dispositive motions.

The two documents issued on this date are meant to be read concurrently, although each is fully supportable on its own. When the two documents issued on this date are read concurrently with the court's March 1997 Memorandum Opinion and Order and the October 29, 1997 Permanent Injunction, one can easily discern the full factual and legal basis for the court's injunction.

**54.** The court notes that its October 29, 1997 Permanent Injunction merely **PROHIBITS THE STATE FROM COERCING RELIGIOUS PRACTICES OR PROMOTING ONE TYPE OF RELIGIOUS ACTIVITY OR VIEWPOINT OVER ANOTHER.** Indeed, the court's Permanent Injunction and March 1997 Opinion and Order goes to great lengths to articulate the activities permitted in public schools under the First Amendment to the United States Constitution as interpreted by the United States Supreme Court and the Eleventh Circuit Court of Appeals. Indeed, the DeKalb County school board, amongst others, noted the clear and distinct guidelines regarding permissible religious activity in public schools that the court's Orders provided educators and the public. As the court's previous Order's disclose, the First Amendment clearly protects personal religious activity and beliefs. At the same time, it clearly prohibits state initiation or promotion of religious activity or beliefs. School officials are arms of the state, and must abide by the requirements of the First Amendment.

The First Amendment requires that states "pursue a course of complete neutrality toward religion." *Jager v. Douglas County School Dist.,* 862 F.2d 824, 828 (11th Cir.1989)(citing *Wallace v. Jaffree,* 472 U.S. 38, 60, 105 S.Ct. 2479, 2491–92, 86 L.Ed.2d 29 (1985)). State initiated or sponsored actions that utilize one type of religious activity over another necessarily "promote" that type of activity over others. As the court's March 1997 Opinion and Order notes: "It was devout religious conviction which led many colonists to leave England and settle in America. Unwilling to suffer the state-sponsored Church of England, many settlers came to this country in search of the right to freely exercise their religious beliefs—to be free from state-established religion." (March Op. and Order at 1553 (citing *Engel v. Vitale,* 370 U.S. 421, 434, 82 S.Ct. 1261, 1268–69, 8 L.Ed.2d 601 (1962).))

The right to be free from state-established religion lies at the heart of the concept of "freedom of religion" embodied in the First Amendment to the United States Constitution. *Lee v. Weisman,* 505 U.S. 577, 591, 112 S.Ct. 2649, 2657–58, 120 L.Ed.2d 467 (1992). When the state forces school-children to pray, or coerces participation in religious activity, it infringes on school-children's freedom of religion in violation of their rights under the First Amendment. *See Jaffree,* 472 U.S. at 49, 105 S.Ct. at 2485–86 (noting that the Fourteenth Amendment "imposed the same substantive limitations on the States' power to legislate that the First Amend-

ment had always imposed on the Congress' power"). For example, the state may not force Christian, Jewish, Buddhist, Baptist, atheist, or agnostic schoolchildren to participate in Muslim religious activities, just as the state may not force Muslim, Jewish, Buddhist, Baptist, atheist, or agnostic schoolchildren to participate in Christian religious activities (the court utilizes these viewpoints for exemplary purposes only—under the First Amendment, each individual is entitled to their own beliefs, free from state intrusion).

Regardless of whether state officials and school boards believe that a particular religious viewpoint is the "correct" viewpoint, the concept of "freedom of religion," embodied in the First Amendment, means that each person is entitled to choose their own religious beliefs and prac-

tices WITHOUT INTERFERENCE OR INFLUENCE FROM THE STATE. *See Jaffree*, 472 U.S. at 52, 105 S.Ct. at 2487 ("the individual's freedom to choose his own creed is the counterpart of his right to refrain from accepting the creed established by the majority"). Freedom of religion necessarily includes freedom *from* religion. *Id.* at 53, 105 S.Ct. at 2487–88 ("the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all"). Contrary to the misstatements, hyperbole, and speculation surrounding **the court's injunction and March 1997 Opinion and Order, the court's Permanent Injunction DOES NOT restrict schoolchildren's First Amendment rights**—*it actually protects those rights from unwarranted and unconstitutional interference from the state.*